**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JAMES WERDLOW # 186514,**

        **Plaintiff,**                      **CASE NUMBER: 09-11009**
                                              **HONORABLE VICTORIA A. ROBERTS**

**v.**

**PATRICIA CARUSO, *et al.*,**

        **Defendants.**
_____/

## ORDER

**I.    INTRODUCTION**

This matter is before the Court on two motions: (1) Defendant Debora Beeker's Motion for Summary Judgment (Doc. # 36) and (2) Defendant Elizabeth Levine's Motion for Summary Judgment. (Doc. # 44) For the reasons discussed below, the Court **GRANTS** both motions and enters judgment in favor of Defendants.

**II.    BACKGROUND**

On March 18, 2009, Plaintiff James Lee Werdlow, a prisoner at Carson City Correctional Facility, filed a complaint against Defendants, both registered nurses for the Michigan Department of Corrections (MDOC) in October 2006 when Werdlow underwent emergency surgery to repair his collapsed left lung, Werdlow alleges that Defendants' response to his medical complaints amounts to deliberate indifference to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution. He filed suit against Defendants in both their individual and official capacities, seeking damages. He now concedes that Defendants are entitled to

1

immunity in their official capacities but still seeks to hold them personally liable.

On October 10, 2006, while Werdlow was incarcerated at the Saginaw Regional Correctional Facility, he submitted a health care request to prison officials complaining of severe upper respiratory chest pain. Werdlow states in his complaint that "on no less than five (5) separate occasions, both nurses[ ] used stethoscopes and other medical devices," and concluded that his vital signs were within a normal range. He says that Defendants gave him Tylenol and instructed him to return to his unit to rest. When Werdlow told Defendants that laying down exacerbated his chest pains, they allegedly told him that there was no doctor on duty on the weekends and that he would be placed on "call-out" to see a doctor on Monday morning.

The record reveals that on October 11, Nurse Roy Gardner examined Werdlow. Gardner examined him again on October 13 and filled out a patient report indicating that Werdlow wanted to see a doctor to discuss his medications and the adverse side effects of his Norvasc medication. The report indicates that Werdlow believed his chest discomfort to be the result of "excess gas and heartburn." The results of Werdlow's physical examination were normal.

On October 15 Werdlow returned to the Health Care Unit. He was examined by Levine at 3:06 pm. He was again experiencing chest pains. Levine noted that there was no radiation of pain. Levine concluded that Werdlow's vital signs were normal, and noted that his examination on October 13 also yielded normal results. She instructed Werdlow to return to his unit, rest, and to call Health Care if his symptoms worsened. Approximately two hours later Werdlow returned. Levine examined him again. Levine made no abnormal findings and when Werdlow told her he may have to see a doctor

2

that evening, she responded that she could not send him to a doctor "with the clinical findings he [was] presenting." Werdlow asked, "what do I have to do–done fall out?" Levine wrote a note that Werdlow may "fall out." She scheduled an appointment for him to see a doctor the next morning.

In the early morning hours of October 16, Werdlow returned to the Health Care Unit. Beeker examined him. Beeker noted that Werdlow complained of tightness in his chest, as if his lungs were constricted. She also noted that Werdlow was very vague in his description of his symptoms, "saying it could be indigestion...." Beeker indicated in her report that Werdlow was making limited efforts to breathe deeply. According to the report, when asked to breathe deeply he took quick, shallow breaths, however, when talking and not concentrating on his breathing, his oxygen measurements were better. She observed that his lungs remained clear. Beeker prescribed some medication and noted again that Werdlow's complaints were vague. The report indicates that Werdlow insisted on seeing a doctor immediately, "to the point of becoming irate."

The next morning Dr. Jan Goldberger examined Werdlow. Dr. Goldberger's report also indicates that Werdlow's complaints were vague. After examining Werdlow with a stethoscope, Dr. Goldberger sent him to the emergency room. Werdlow says doctors at Covenant Hospital discovered that his left lung had collapsed. He states they performed emergency surgery on him.

## III. ARGUMENTS AND ANALYSIS

Defendants contend they are entitled to immunity from suit in both their individual and official capacities -- qualified immunity in their individual capacities and Eleventh

3

Amendment immunity in their official capacities.

Werdlow agrees that Defendants are entitled to immunity in their official capacities, but argues that they are not entitled to qualified immunity in their individual capacities. Werdlow contends that Defendants' motions should be denied because their conduct demonstrates a custom of characterizing his medical complaints as vague. He further argues that Defendants used derogatory language to describe his complaints and condition, and that their mockery demonstrates their culpable state of mind.

### A. Legal Standard

The Court will grant summary judgment in favor of the moving party if that party establishes that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e)(2). The Court views the evidence in favor of the non-moving party. *Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 138 (6th Cir. 1993). However, the evidence supporting the plaintiff's position must be more than a mere scintilla; it must be sufficient for the jury to reasonably find in favor of the plaintiff. *Liberty Lobby*, 477 U.S. at 252. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict- whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* (citation

and internal quotation marks omitted) (emphasis in original).

      **B.**      **Defendants are entitled to qualified immunity**

Qualified immunity is an affirmative defense which "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In a qualified immunity case, "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). "Stated differently, a defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010) (citation and internal quotation marks omitted). Once qualified immunity is raised as a defense to the action, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). The two-part burden outlined above is a heavy one for the plaintiff to overcome. *See Goss v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001) (citation and internal quotation marks omitted).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated that courts consider prongs one and two of this two-part analysis in sequential order. Recently, in *Pearson v. Callahan*, — U.S. ----, 129 S.Ct. 808, 818 (2009), the Supreme Court abandoned this mandatory sequence, leaving it within a court's discretion to

5

undertake the two-part analysis in which ever order it deems most appropriate. "However, because *Pearson* left in place *Katz*'s core analysis, all Pre- *Pearson* case law remains good law." *Aldini*, 609 F.3d at 863 (citing *Jones v. Byrnes*, 585 F.3d 971, 975)). "Evaluating the defense of qualified immunity on a motion for summary judgment requires that the court 'adopt the plaintiff's version of the facts.'" *Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372 (2007)).

In *Estelle v. Gamble*, the Supreme Court concluded that "the deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ...proscribed by the Eighth Amendment." *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Deliberate indifference can be manifested in health care staff's response to a prisoner's medical needs. *Id.* (citing *William v. Vincent*, 508 F.2d 541 (2d Cir. 1974)). For example, the Sixth Circuit has said that "[a] plaintiff may establish deliberate indifference...by a showing of grossly inadequate medical care." *See Cook v. Martin*, 148 Fed.Appx. 327, 2005 WL 2175922, *10-*11 (6th Cir. July 27, 2005) (citing cases).

Nonetheless, "[not] every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* at 105. A complaint that a health care provider was negligent in diagnosing or treating an ailment, or otherwise inadvertently failed to provide adequate medical care, does not state a valid claim under the Eighth Amendment. *Id.* at 105-06; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."). In *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), the

Supreme Court explained that a prisoner cannot show that he was subjected to cruel and unusual punishment at the hands of a prison official unless the deprivations alleged are sufficiently serious and the prison official had a sufficiently culpable state of mind.

In order to hold Defendants liable for deliberate indifference to his serious medical needs, Werdlow must establish that Defendants knew of and disregarded an excessive risk to his health and safety when they responded to his medical complaints. *Farmer*, 511 U.S. at 838 (1994). They must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [they] must [have] also draw[n] the inference." *Id.* Courts may infer the existence of a culpable state of mind from the fact that the risk of harm is obvious. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842). However, "[e]mphasizing the subjective nature of this inquiry, the Supreme Court has noted that 'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot...be condemned as the infliction of punishment.'" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 838) (emphasis added in *Comstock*). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105.

Assuming, without deciding, that Defendants' conduct violated Werdlow's right to be free from cruel and unusual punishment, the Court finds that it was not clearly established that Defendants' conduct violated that right, and Defendants are entitled to

7

qualified immunity on that ground. The Supreme Court, in *Pelzer*, explained the object of the "clearly established" immunity standard, and how that standard is met, as follows:

> [Q]ualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S., at 206, 121 S.Ct. 2151. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell v. Forsyth*, 472 U.S. 511, 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 438 U.S. 635, 640, 107 S.Ct. 30334, 97 L.Ed.2d 523 (1987).

536 U.S. at 739.

"[T]he salient question...is whether the state of the law in [2006] gave respondents fair warning that their alleged treatment of [complainant] was unconstitutional." *Id.* at 741. The standard turns on "the objective legal reasonableness of an official's acts." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). "This inquiry...must be undertaken in light of the specific context of the case." *Katz*, 533 U.S. at 201. Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that [her] conduct was unlawful in the situation [she] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

From Werdlow's account, on the weekend of October 15, 2006, he complained to unit officers that he was experiencing chest pain and having trouble breathing. As a result, "[o]n no less than five (5) separate occasions [Defendants] used stethoscopes and other medical devices" and determined that Werdlow's vital signs were normal. Defendants gave Werdlow Tylenol for the pain and instructed him to rest. When he responded that laying down exacerbated the problem and requested to see a doctor, he

8

was told that there was no doctor on duty and that he would be seen by a doctor on the following Monday morning, October 16, 2006.

Werdlow's medical records reveal he visited Levine on October 15, 2006 around 5:00 pm. Levine's progress note from that visit indicates that she examined Werdlow earlier that day and that since the examination Werdlow complained that the pain was worse. At the earlier examination Levine noted that there was no radiation of pain, no murmur and that Werdlow's breathing was even and unlabored. There were no abnormal findings. (*Id.*)

Levine re-examined Werdlow, checked his vital signs, and determined that she could not send him to the hospital with the clinical signs he was presenting. Instead, she sent him back to his unit and scheduled an appointment for him to see a doctor at 8:00 a.m. the next day. In the early morning hours of October 16, Werdlow returned to the Health Care Unit and was this time examined by Beeker. Beeker's notes indicate Werdlow was sleeping with no problems when he suddenly awoke, complaining of tightness in his chest as if his lungs were constricted. Her notes state that Werdlow's complaints were very vague and that he thought he could be experiencing the effects of indigestion. Beeker examined Werdlow and made no abnormal findings, although she did note that his breathing was quick and shallow. Beeker prescribed several medications and noted that Werdlow had an appointment with a doctor in the morning.

Werdlow's medical records from earlier in the week show that he complained of side effects from his blood pressure medication and from the effects of heartburn and gas. Records from October 13, 2006 indicate that Werdlow described his chest discomfort as resulting from excess gas and heartburn, and possibly related to the

9

adverse side effects of a medication he was taking. The nurse who examined him on that day made no abnormal findings.

While Defendants probably should have taken Werdlow's complaints more seriously, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Because of this reluctance, Werdlow can hardly argue that the law at the time in question clearly established that Defendants' conduct violated the Constitution.

Werdlow does not claim that he received no treatment at all or that his complaints were completely ignored. Rather, he challenges the adequacy of the examinations conducted and of the treatment he received. He essentially argues that he was mis-diagnosed and that Defendants should have sent him to a doctor right away. However, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th cir. 1999); *see also Jennings v. Al-Dabagh*, 275 F.Supp.2d 863, 870 (E.D. Mich. 2003) ("[T]he fact that a prisoner disagrees with a course of treatment that he was prescribed, or even that the treatment he did receive was negligently administered, does not rise to a constitutional violation."). Thus, while it is doubtful that Defendants' conduct violated Werdlow's constitutional rights at all–Werdlow even seems to concede that Defendants did not draw the inference that a substantial risk of serious harm existed, *see* Plaintiff's Response to Elizabeth Levine's Rule 56(b) Motion for Summary Judgment, at p. 5 ("[T]he notations in the medical records signify their

10

belief that there was nothing wrong with Plaintiff")--it is clear that if their conduct did violate the Constitution, Defendants were not on notice of the violation because it was not clearly established, and they are entitled to qualified immunity.

An evaluation of relevant case law leads to the same conclusion. In a case factually similar to this one, *Cairelli v. Vakilian*, the Sixth Circuit held that a prison doctor who failed to diagnose and treat an inmate's heart disease, resulting in the inmate's death, did not display deliberate indifference to the inmate's serious medical need. 80 Fed.Appx. 979, 2003 WL 22718249, at * 7 (6th Cir. Nov. 17, 2003). The prisoner, Albert Cairelli, exhibited symptoms similar to those suffered by Werdlow. He suffered shortness of breath and chest pains. *Id.* at *2. He also experienced pain in his left arm. *Id*. at * 1. Cairelli reported to the prison infirmary and was examined by a nurse. *Id.* The nurse contacted the defendant doctor and described Cairelli's symptoms. *Id*. at *2. The defendant instructed the nurse to give Cairelli two Tylenol and to admit him to the infirmary for observation. *Id.* The defendant examined Cairelli the next day, and although he was aware that there was a history of heart disease in Cairelli's family, Cairelli was a smoker, two electrocardiogram ("EKG") exams administered the previous day came back abnormal, and Cairelli had been complaining of chest pains over the prior two to three weeks, he "discharged him from the infirmary, ordered a cardiac enzymes test, and prescribed one tablespoon of Pepto Bismol...." *Id.* The defendant did not order the cardiac enzymes test to be expedited and Cairelli died of a heart attack the next day. *Id*.

Calling it a "close" case, the Sixth Circuit ultimately affirmed the district court's grant of summary judgment in favor of the defendant, holding that the plaintiff could not

prove that the defendant *"actually drew the inference* that Cairelli was at substantial risk of serious harm." *Id.* at 5 (emphasis in original). The Sixth Circuit emphasized that it was not enough for the plaintiff to show that the defendant objectively should have drawn the inference. *Id.* The court concluded:

> While Vakilian subjectively perceived facts that indicated to him that Cairelli's symptoms could be an indication of heart problems, the facts also indicate that Vakilian inferred that it was more likely that Cairelli was suffering from gastrointestinal distress. The fact that this conclusion was incorrect, or even unreasonable, does not affect our analysis. *** Where...a doctor is presented with symptoms that could indicate heart attack or indigestion and the doctor treats indigestion when the problem is actually a heart attack, we are hard pressed to find deliberate indifference without a showing of subjective awareness, even when the decision to treat indigestion is unreasonable. *** The fact that the symptoms may have suggested that one problem was more likely than the other does not mean that the facts were so obvious that Cairelli actually was having a heart attack that awareness may be imputed to Vakilian.

*Id.* at *5-*6.

Thus, when action is taken in the face of prisoner complaints, a failure to diagnose, or a mis-diagnosis, absent a showing that the defendant is subjectively aware that the plaintiff prisoner is actually suffering from a different ailment, cannot be the basis of an Eighth Amendment claim. *See also Shade v. City of Middletown, Oh.*, 200 Fed.Appx. 566, 2006 WL 2986398, at *2-*3 (6th Cir. Oct. 17, 2006) ("Obviously, as events unfolded, it became clear that Hogan failed to diagnose correctly that plaintiff was suffering from West Nile Virus. ... But, it is also clear from the record that, contrary to the plaintiff's allegations, defendant Hogan did not callously ignore the serious medical condition from which Shade was suffering. Instead, she closely monitored that condition and took reasonable steps to address the outward manifestations."); *Gabehart v. Chapleau*, No. 96-5050, 110 F.3d 63 (Table), 1997 WL 160322, at *2 (6th Cir. Apr. 4,

12

1997) ("We have carefully reviewed the record in this case and we are left with no doubt that it does not contain sufficient evidence to permit a reasonable jury to conclude that [Defendants] knew or suspected that Gabehart's condition was as serious as it proved to be. Without evidence from which a jury could infer that the defendants 'consciously disregarded a substantial risk of serious harm' to Gabehart...there can be no finding that the defendants' treatment of Gabehart constituted cruel and unusual punishment.") (citation omitted).

In another case, the Tenth Circuit affirmed the district court's grant of summary judgment to a nurse who treated a plaintiff prisoner who claimed to be experiencing "continuing chest pain." *Mata v. Saiz*, 427 F.3d 745, 750 (10th Cir. 2005). The plaintiff described the pain to the nurse as an "eight" on a scale from "zero to ten." *Id*. The nurse performed an electrocardiogram ("EKG") on the plaintiff and read the results as normal. *Id*. She then gave the plaintiff a "lay-in" and a permission slip to allow her to miss work and other prison-related duties that day. *Id*. It was determined the next day that the plaintiff had suffered a heart attack and she subsequently suffered permanent and irreversible heart damage and permanent disability. *Id*.

Focusing on plaintiff's normal EKG, the lack of pain in her arm, her normal color and clear lungs, the court held that the record demonstrated that the nurse subjectively believed that the plaintiff was not having a heart attack, and that her chest pain had been relieved. *Id.* at 760. Similarly, both nurses Beeker and Levine examined Werdlow using "stethoscopes and other medical devices" and found nothing abnormal. They had access to his medical records, which indicated that just one or two days before, Werdlow attributed his chest discomfort to heartburn and gas, and possibly to the

13

effects of a medication that he decided to stop taking. Although Werdlow complained of some troubling symptoms, his complaints were vague, as noted not only by Beeker, but by the doctor who examined him on Monday morning and who sent him to the emergency room.

These two cases, both factually similar to this one, support the conclusion that even if Werdlow could establish that Defendants were deliberately indifferent to his serious medical needs for failing to send him immediately to a doctor when he complained of chest pains and trouble breathing, he cannot show that it was clearly established that Defendants' delay was a violation of his Eighth Amendment right. *See Brosseau*, 543 U.S. at 201 (cases that do not squarely govern the case at bar but that are similar, taken together, show that the conduct at issue was not a clearly established violation of constitutional rights).

The Court briefly addresses two arguments made in response to Defendants' motions. First, Werdlow likens his situation to that of the plaintiff in *Westlake*, where the Sixth Circuit reversed the district court's dismissal of plaintiff's § 1983 claim based on a violation of the Eighth Amendment. (See Doc. # 46, p. 6) That case, however, is inapposite. In *Westlake*, jail officials were subjectively aware that plaintiff suffered from an ulcer and required a special diet and medication, because he told them as much. 537 F.2d at 859. On multiple occasions, the plaintiff requested to receive treatment for his condition. However, jail officials refused to take him to a doctor. *Id.* The plaintiff's condition worsened and he began to vomit blood. *Id.* Jail officials' response was to give him a mild antacid; they told him that he would have to wait at least two days to see a doctor. *Id.* The plaintiff continued to suffer and request immediate medical attention;

14

these requests went unheeded. *Id.*

Importantly, in *Westlake*, the plaintiff received no medical attention. Here, Werdlow admits that Defendants examined him at least five times. The Sixth Circuit "distinguish[es] between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Id.* at 860 n. 5. In cases where some medical attention is provided, "federal courts are generally reluctant to second guess the medical judgements" of those providing treatment. *Id.* After finding no abnormalities in Werdlow's vital signs, Defendants prescribed medication to address what they thought, after hearing Werdlow's vague complaints, may be the cause of his ailment. Unlike in *Westlake*, Defendants had no basis to believe that Werdlow was suffering from anything more serious than gas and/or heartburn.

Werdlow makes the novel argument, in his response to Defendants' motions, that Defendants' descriptions of his complaints as "vague" demonstrate a "'custom' practiced among nursing personnel whenever they examine patients, for purposes of not having to administer attention to serious medical needs." He also accuses all of the health care staff at Saginaw Regional Correctional Facility of writing derogatory information about him in his medical records, and claims that this derogatory information is evidence of Defendants' culpable state of mind. (Doc. #48, p. 4, ¶ 17)

The Court reads the information contained in Werdlow's medical file differently than he does. The excerpts selected by Werdlow are not derogatory, or belittling. Instead, they appear merely to be notations recording what the nurses observed while examining Werdlow. For example, Levine's note that Werdlow "may 'fall out'" reveals

her good faith belief, in response to a comment made by Werdlow, that Werdlow might malinger in an attempt to be taken to a hospital that evening. Likewise, Beeker's note that Werdlow was making limited effort to breathe deeply, while potentially incorrect, simply reflects her mistaken belief that Werdlow was not as sick as he was later determined to be. Defendants' mistakes in this regard cannot be the basis for establishing liability. These notes can also be read as evidencing that Defendants were not aware of Werdlow's serious medical condition.

The fact that Beeker used the term "vague" to describe Werdlow's complaints in her October 16 report, does not establish her subjective knowledge of a significant risk of serious medical harm. Rather, it tends to show the opposite -- that Beeker was subjectively unaware of the risk because Werdlow's complaints were not clear. Moreover, the use of the term "vague" on only one occasion, an October 16 Patient Report, does not establish a widespread custom or policy on the part of MDOC, or the nursing staff at MDOC, to abdicate the obligation to attend to the serious medical needs of prisoners.

Werdlow does not allege in his complaint that his injury was the result of a formal MDOC custom or policy. Where there is no identification of a formal policy or custom, approved by the appropriate decisionmaker, a plaintiff must present sufficient evidence that the defendant implemented a custom that is "'so permanent and well settled as to constitute a custom or usage with the force of law" to establish liability as a result of a custom that caused a constitutional deprivation. *Doe v. Claiborne Cty. Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). Werdlow fails to present sufficient evidence to create a genuine issue as to the

16

existence of a permanent, widespread custom, implemented by Defendants, of using "derogatory language" and labeling medical complaints as "vague" in prisoner medical files.

### C. Werdlow's remaining claims lack merit

Werdlow challenges the authenticity of Exhibit B, attached to Beeker's Motion for Summary Judgment, in an attempt to argue that her affidavit was submitted in bad faith. The Exhibit purports to be portions of Werdlow's medical file from the time period in question.

Werdlow cannot question the authenticity of a document and at the same time rely on the document to support his theory of liability. He repeatedly points to the documents in the Exhibit as proof of Defendants' culpable state of mind. Further, the Court does not discern any conflict between Defendants' Exhibit B and Werdlow's Exhibit 2, and these documents do not call into question the good faith of Beeker's affidavit.

Lastly, the Court finds no evidence that defense counsel "unreasonably and vexatiously" multiplied the proceedings. 28 U.S.C. § 1927 (1980).

## IV. CONCLUSION

Defendants' motions are **GRANTED**. Judgment is entered in favor of Defendants Levine and Beeker.

**IT IS ORDERED.**

                                                  /s/ Victoria A. Roberts
                                                  Victoria A. Roberts
                                                  United States District Judge

Dated: December 8, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record and James Werdlow by electronic means or U.S. Mail on December 8, 2010.

s/Linda Vertriest
Deputy Clerk